UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


DOLORES MONTGOMERY, PERSONAL )
REPRESENTATIVE OF THE ESTATE OF )
JOHN MONTGOMERY,                      )
            Plaintiff,                   )
                                )
   vs.                                        )             1:06-cv-0915- RLY-TAB
                                )
MORGAN COUNTY, MORGAN            )
COUNTY SHERIFF'S DEPARTMENT,   )
ROBERT W. GARNER, SHERIFF, STEVE )
HOFFMAN, BRENT WORTH, ANDY      )
BEAVER,                                     )
            Defendants.

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


John Montgomery ("Montgomery") was shot dead by Steve Hoffman, a Morgan

County Indiana Sheriff's Deputy.  At the time he shot Montgomery, Deputy Hoffman was

one of three deputies attempting to execute on an "Order For Apprehension and Return"

issued by the Marion Superior Court, identifying Montgomery as an individual with a

mental illness who had either escaped following commitment or failed to comply with the

required conditions of his outpatient status.   The order required the Sheriff to take charge

of Montgomery and return him to the nearest state institution or community health center

with facilities sufficient to properly detain him.  At the time he was shot, Montgomery

was 29 years old, suffering from a bipolar mental condition and not taking his medication.

He was agitated and wielding a two to three foot long piece of metal pipe with a clamp

attached, swinging it violently back and forth and striking one of the three deputies who had entered Montgomery's grandparents' house to gain his surrender.

Without question, the shooting was a tragedy.  The Plaintiff, Dolores Montgomery, who is John Montgomery's mother and the personal representative of his estate, contends that his death was more than a tragedy.  She claims it was a consequence of a breach of his constitutional rights and a consequence which could have been avoided.  She has filed this lawsuit claiming that the deputies' forced entry and Hoffman's use of lethal force to subdue her son was a violation of Montgomery's rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution.  She seeks damages pursuant to 42 U.S.C. § 1983 on behalf of Montgomery's estate.

Morgan County, the Morgan County Sheriff's Department, Sheriff Robert Garner and Deputies Steve Hoffman, Brent Worth and Andy Beaver comprise the Defendants in this litigation.  They claim the June 14, 2004, entry into the residence where Montgomery was found was a necessary and appropriate action required in order to carry out the order of apprehension and that the use of lethal force was reasonable under the unfortunate circumstances that developed during the three deputies' attempts to gain Montgomery's cooperation.  The Defendants contend that no material questions of fact remain and that they are entitled to summary judgment as a matter of law.  For the reasons expressed in this entry, the court agrees that the Defendants are entitled to summary judgment.

## Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A court's ruling on a motion for summary judgment is akin to that of a directed verdict. The essential question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id*. at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The Local Rules of the Southern District of Indiana require that the party responding to a summary judgment motion include a section in its brief "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment." S.D. IND. Local Rule 56.1(b). Plaintiff has not done that. She has filed a brief titled "Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Deny Defendants' Motion for Summary Judgment." Her brief does not contain a section which specifically seeks to identify disputed facts. It does contain a section entitled "Statement of Material Facts," but the portion of that section which contains supporting evidentiary references essentially duplicates the facts as presented by the Defendants. For the most part, where Plaintiff asserts a difference in the facts, she offers no supporting citations to the record.

Local Rule 56.1 is intended to focus the attention of both the parties and the court on which material facts are truly being disputed; hence, the rule's dictate that "the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy" if they are not specifically controverted in the opposing party's "Statement of Material Facts in Dispute." Despite the Plaintiff's failure to follow the local rule, the court has attempted to determine if there are any material facts in dispute and has examined the facts in a light most favorable to her.

4

However, where it was at all unclear whether a specific factual statement set forth by Defendants was being contested, that factual statement was assumed accurate.

## Admissions

Further diminishing Plaintiff's ability to contest the facts as presented by the Defendants was her failure to timely respond to a set of requests for admission, served on her by Defendants pursuant to Rule 36 of the Federal Rules of Civil Procedure.  That rule provides that the matter upon which an admission is sought "is admitted unless, within 30 days after service of the request, ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection ...."  Fed. R. Civ. P. 36(a).  The admissions sought were as follows:

1.      Prior to entering the residence at 8389 Briarhopper Road, Monrovia, Indiana, on June 14, 2004, the officers, or at least one of them, announced their presence and identities as police officers to the occupant of the house.

2.      Following their entry into 8389 Briarhopper Road, Monrovia, Indiana, on June 14, 2004, the officers, or at least one of them, announced their presence and identities as police officers to the occupant of the house.

3.      Following his entry into 8389 Briarhopper Road on June 14, 2004, Deputy Andy Beaver was subjected to an unprovoked attack by John Montgomery, who was using a table clamp or other metal object as a weapon.

4.      Both Andy Beaver and Brent Worth were injured as the result of the attack by John Montgomery with the table clamp or other metal object.

5.    At the time John Montgomery was shot, he was engaged in an attack on Andy Beaver using the table clamp or other metal object.

As stated, Plaintiff did not respond or object to the admissions in a timely fashion. In addition, Plaintiff failed to timely respond to discovery requests served by the Defendants and missed filing deadlines established in the case management plan. As a result, a show cause hearing was held before the Magistrate Judge assigned to this matter. The Magistrate Judge noted the failure of Plaintiff and her counsel to meet important deadlines, but allowed her leave to make certain late filings and serve late discovery responses. However, in his order of April 2, 2007, the Magistrate Judge specifically reserved the issue of whether or not Plaintiff's failure to respond to the requests for admission should cause those matters to be admitted.

This case is now at the summary judgment motion stage and the issue of admissions must be addressed. The rule is crystal clear; fail to respond to a request for admission and that matter is deemed admitted. Plaintiff has offered no excuse for her failure to meet the deadline. She simply maintains that she has no way of knowing whether the facts of the confrontation, as related by the deputies, are accurate. While she is correct regarding the scope her own knowledge, there was nothing which prohibited her from timely responding that, after reasonable inquiry, she was unable to admit or deny the matters sought to be admitted. *See Asea, Inc. v. Southern Pacific Transportation, Co.* 669 F.2d 1242, 1247 (7th Cir. 1981) (party responding to request for admission has a duty to

make reasonable inquiry).  Moreover, Plaintiff has presented nothing, other than

speculation, which would call into question the matters sought to be admitted.

Accordingly, the facts this court will view as undisputed will include those which were

admitted as a result of  Plaintiff's failure to timely respond to the requests for admission.

## Facts

On the evening of June 14, 2004, the dispatcher for the Morgan County Sheriff's

Department gave Deputy Hoffman an Order for Apprehension and Return of John

Montgomery, which the department had received earlier that day.  The order had been

faxed from Marion County and was signed by an Indiana civil court judge.  At the bottom

of the order was identifying information and Montgomery's last known address was listed

as 8389 N. Briarhopper Road, Monrovia, Indiana.[1] The sheriff of the county where a

person who has escaped from commitment is located is responsible for taking charge of

that individual and returning him to the appropriate facility under such an order.  Ind.

---

[1]The order, signed by Judge Charles J. Deiter of the Marion Superior Court, read as follows:

It being found by the Court that JOHN PATRICK MONTGOMERY has escaped from ADULT & CHILD to which the individual is committed under I.C. 12-26, or has failed to comply with the requirements for outpatient status in accordance with I.C. 12-26-14-8.

IT IS THEREFORE ORDERED THAT THE SHERIFF OF MARION COUNTY, INDIANA, shall take charge of and return the Respondent, JOHN PATRICK MONTGOMERY, to the nearest State institution listed or the community mental center that has appropriate and available facilities and personnel to detain the individual, all of which is authorized in I.C. 12-24-8-1, which is found to be COMMUNITY HOSPITAL NORTH.

ALL OF WHICH IS ORDERED this 14th day of JUNE, 2004.

Code § 12-24-8-1.  Attached to the order was a post-it note with the name "Delores [sic] Montgomery" hand written on it, along with a work and home telephone number.

Hoffman took the order and went to fuel his car before heading to Monrovia.  At the fuel pumps he came into contact with Deputy Andy Beaver, who was the shift supervisor for the evening shift.  Hoffman advised Beaver of the order and Beaver stated that he would join Hoffman to execute on the order.  Most often, orders of apprehension and warrants were acted on by more than one Morgan County deputy.  As Hoffman and Beaver proceeded toward Monrovia, Hoffman received a cell phone call from Deputy Brent Worth, who had seen them heading out together and inquired as to their destination.  Upon being advised of the nature of the run, Worth advised Hoffman that he also would accompany them to assist in the process.  That evening, Deputy Hoffman had a student intern, Richard Clayton, riding with him.  One of the dispatchers for the Morgan County Sheriff's Department, Scott Arnold, was a rider as well, in Deputy Worth's vehicle.

Upon their arrival at 8389 Briarhopper, the three deputies pulled their vehicles into the driveway behind a parked vehicle which had its door partially open.  The three deputies and the dispatcher exited their vehicles, with Beaver and Hoffman heading to the front porch and Worth and Arnold proceeding to the rear of the residence.  As Worth and Arnold passed a window, they looked in and observed a male moving through the house, toward the front door area, carrying what appeared to them at the time as a stick-like object.  They notified Beaver and Hoffman of their observation and went on to the back

8

of the residence.

At the front door, Beaver and Hoffman knocked, announced their presence and requested that any occupant come to the door.  Worth made a similar effort to get a response from an occupant while at the back door.  Despite the lack of response from within, the officers continued to knock and announce for several minutes, and even circled the home's perimeter and tapped on windows.  After several unsuccessful attempts to prompt a response from Montomery, Beaver asked to see the order that Hoffman had been given.  Unsure of the authority granted by the order, Beaver telephoned dispatch and requested that he be connected to the deputy prosecutor on call.  Harold Blake was the prosecutor on call.  Blake spoke with Beaver and advised him that the order gave the deputies authority to force entry into the house, if necessary, to apprehend Montgomery.  He suggested Beaver make entry only if he had back-up, because the very issuance of an order to retrieve a committed individual suggests that individual may be a danger to himself or others.

After speaking with Blake, Beaver attempted to call Dolores Montgomery at both the home and work numbers listed on the post-it note.  No one answered either of his calls.  Beaver did get in touch with Captain Brian Ringer, an officer who, according to dispatch, had tried to locate Montgomery earlier.  Beaver contacted Ringer in an effort to determine if he had had contact with Dolores Montgomery or any of Montgomery's relatives.  From his phone conversation with Captain Ringer, Deputy Beaver learned that

9

Ringer and others had executed a similar order without confrontation the previous month.

While Beaver was on the telephone, Deputy Hoffman was approached by a neighbor. The neighbor asked Hoffman if they were there for John Montgomery and, when told that they were, he advised Hoffman that Montgomery was in the house and then described the layout of the house.  He told Hoffman that the last time law enforcement was out to get Montgomery, they found him hiding in the basement.  Having been unable to reach Dolores Montgomery, Beaver and the other deputies decided to enter the residence to apprehend Montgomery.  They tried to open the front door, but it was locked.

Deputy Hoffman remembered seeing a set of keys in the car that was parked in the driveway ahead of their three vehicles.  He retrieved the keys and the deputies were able to use one key to open the storm door, but not the main door.  Deputy Worth then used a drivers license to release the lock on the main door.  With the door open, the deputies again announced their presence and asked that Montgomery come to the door to speak to them.  Deputy Beaver continued to make this verbal request as Worth exited and directed Arnold and the intern to go to the rear of the residence.  When Worth returned, the deputies decided to proceed into the house.  Deputies Beaver and Worth went in armed with non-lethal tasers and Hoffman had his duty weapon drawn for back-up.  (After they entered, they were in the living room of the house).  Hoffman and Worth then proceeded through an opening to the left into the kitchen and Beaver proceeded through the living

10

room toward a hall, leading to the rear of the house.  The front rooms of the house were still relatively well lit from natural light entering through the windows, but the rooms toward the middle and rear of the house were not.

As Beaver proceeded down the hall with a flashlight in one hand and the taser in the other, he saw John Montgomery standing in the first darkened doorway to his left with a pipe-like object held over his head.  When the two made eye contact, Montgomery let out a loud scream and attacked Beaver swinging the pipe-like object at him.  Beaver began yelling for Montgomery to stop and drop the weapon he was swinging.  As Montgomery continued his attack and his screams, Beaver kept yelling for him to stop and get down on the floor. The first or second blow from the pipe hit the taser Beaver was holding, knocking the cartridge from it and rendering it useless.  Montgomery continued to swing the pipe as Beaver began to scramble backwards toward the kitchen to seek assistance while trying to ward off Montgomery's blows with his flashlight.

Hoffman and Worth were at the far end of the kitchen when they heard Beaver and Montgomery yelling.  They immediately turned and started toward the noise.  They saw Deputy Beaver stumble into the kitchen with Montgomery following, swinging the pipe. Beaver went down to a knee with Montgomery standing over him, swinging the pipe clamp at him and landing blows.  Initially, Worth believed that Beaver and Montgomery were too close and the activity of Montgomery too wild to permit a successful taser shot. So, he approached Montgomery in an attempt to distract him from Beaver.  Montgomery

11

turned on Worth, swinging the pipe clamp at him and hitting his hand just as Worth

decided to fire the taser.  The probes from the taser missed Montgomery and ended up in

the frame of the doorway to the kitchen.  In addition to hitting Worth in the hand with the

pipe, Montgomery hit him in the shoulder and knocked him back into the kitchen sink.

Beaver and Hoffman did not initially know that Worth had missed when he fired

his taser.  They heard Worth's taser cycling and assumed Montgomery would soon stop

swinging the pipe; but instead, Montgomery turned again to Beaver and began swinging

the pipe alternately from the right to left at the downed officer.  Hoffman then fired two

or three shots at Montgomery, but Montgomery continued beating on Beaver.  Hoffman

then fired several more shots until Montgomery ceased the attack, retreating to the living

room, where he collapsed to the floor.  It was a matter of seconds between the moment

the officers started through the home and when Hoffman fired his service weapon.

The deputies began first aid efforts on Montgomery immediately and quickly

contacted dispatch to request emergency medical units and a Lifeline helicopter.

Montgomery was flown to Methodist Hospital in Indianapolis, where he later succumbed.

Worth had injuries to his thumb and hand, while Beaver suffered bruises to his legs and

back and required some stitches for a cut on his back.  The first that the Sheriff knew of

the apprehension order was when he was notified by dispatch that an officer had shot

Montgomery during the course of an attempt to act on the order.

**Discussion**

Plaintiff alleges liability for the following unlawful conduct, pursuant to 42 U.S.C.

§ 1983:

1.    Violation of Montgomery's right to due process and equal
      protection under the law;

2.    False Arrest;

3.    Unreasonable use of excessive force;

4.    Failure to provide appropriate training and supervision.[2]

The overall theme of Plaintiff's argument is that Montgomery was not in the

course of criminal conduct and, therefore, the officers had no need to act as they did.

Plaintiff contends that time was not of the essence and the Sheriff's Department and its

deputies should have realized from past experience, or from better training, that a forced

entry with both lethal and non-lethal weapons drawn was not a necessary or effective

method for gaining the compliance of Montgomery or any similarly afflicted mental

patient.

Because 42 U.S.C. § 1983 is not itself a source of substantive rights, but a means

for vindicating federal rights conferred elsewhere, the first step in any § 1983 case is to

---

[2]In her briefing on the summary judgment motion, Plaintiff concedes that Morgan County cannot be held liable, but indicates that she continues to pursue official capacity liability against the Sheriff and his department for inadequately training the deputies with regard to handling people with mental disabilities.

identify the specific constitutional rights that may have been infringed.  *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  While the complaint scatters allegations of various rights infringements, in her brief filed in response to the summary judgment motion, the Plaintiff appropriately focuses on Montgomery's Fourth Amendment right to be free from unreasonable search and seizure,[3] including the right to be free from the use of excessive force.  Cases involving allegations of excessive force during the course of a seizure are not analyzed under a due process standard; rather, it is a Fourth Amendment "reasonableness" test that applies.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  There is also an assertion in Plaintiff's brief that Montgomery was not accorded equal protection under the laws.  However, upon examination, the record does not support a violation of either the Fourth or Fourteenth Amendment.

Chronologically, this court must first determine whether the deputies had a right to forcibly enter the premises.  That conclusion can only be reached after the force and effect of the order of apprehension is determined.  Relying on *Robinson v. State,* 538 N.E.2d 932 (Ind. 1989), Harold Blake, the prosecutor on phone duty that night, informed Deputy Beaver that inherent in the order of apprehension was a right to forcibly enter the premises in order to take charge of Montgomery and return him to the medical facility as

---

[3]The complaint mentions false arrest in its recitation of wrongs; however, there is no separate false arrest claim here.  Any seizure or arrest that could be said to have occurred, did so after the point in time when Deputy Hoffman fired his gun.  In order for there to be a seizure there must be a yielding to the show of authority, and Montgomery did not yield until he was shot.  *California v. Hodari D.*, 499 U.S. 621, 624-25 (1991).

required by the order.  Article 26 of Title 12 of the Indiana Code, provides the statutory
scheme for the commitment of mentally ill individuals.  Pursuant to that statutory scheme,
in order for Montgomery to have been committed to a mental health facility or ordered to
attend an outpatient treatment program, a state court was required to find that he was
mentally ill and either dangerous or gravely disabled.  Ind. Code § 12-26-8(a).  Upon
escape of such an individual, the legislature assigned the local sheriff the duty of
apprehending the individual.  Ind. Code § 12-24-8-1.  The probate court of Marion
County, was the court with jurisdiction to issue an order notifying the sheriff of a
committed individual who has escaped or otherwise improperly left a treating facility and
require his apprehension and return.  Ind. Code § 26-1-2.

It is certainly true that the *Robinson* case stands for the proposition that under
Indiana law an order authorizing a "civil arrest", such as the order of apprehension in this
case, carries with it an authorization to forcibly enter premises in order to carry out the
intent of the order.  *Id*. At 934.  Deputy Beaver showed appropriate judgment in checking
with the department's legal resource to confirm the effect of the order.  And, while he
had no reason to question the interpretation and advice provided by Blake, the question
remains as to whether the authority provided by the Indiana Supreme Court's decision in
*Robinson* squares with federal court interpretations when constitutional violations are
alleged.

Generally, there is a presumption that a warrantless entry is unreasonable under the

15

Fourth Amendment.  *Leaf v. Shellnutt,* 400 F.3d 1070, 1081 (7th Cir. 2005).  The purpose of this presumption is to safeguard the special privacy expectations traditionally recognized in the American home by requiring that, a neutral and detached judicial officer make an independent assessment of whether there is probable cause to effect an intended search or arrest within the home.  *See Steagald v. U. S.*, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647-48, 68 L.Ed.2d 38 (1981).  The warrant requirement is not absolute, of course, and the presumption may be overcome by exigent circumstances or special needs.  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003).

In a case in this court, Judge David F. Hamilton, treated a body attachment order issued by an Indiana state court for failure to appear at a child support hearing as an arrest warrant.  *See Hankins v. City of Rushville*, 2005 WL 2100068 (S.D.Ind. 2005).  In granting summary judgment in favor of the defendant city and law enforcement officers on a § 1983 claim alleging a Fourth Amendment violation, Judge Hamilton wrote:

> ... The body attachment issued by the Rush Circuit Court was a valid warrant at the time Hankins was arrested, and he has shown nothing to the contrary.
>
> Hankins claims that the entry of the RPD officers into his residence was unlawful.  However, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives where there is reason to believe the suspect is within.

*Hankins*, 2005 WL 2100068 at *2.

16

The order issued in the case at bar is similar to that issued by the Rush Circuit Court in *Hankins,* in that they were issued as a result of civil, rather than criminal, proceedings.  While the term "warrant" is not a part of the title of either order, they both have the intended legal effect of authorizing law enforcement officers to locate and bodily attach or apprehend an individual.  They are issued by a judicial officer after assessment of the need to bring the person under the control of the authorities, either because of the danger they posed to themselves or others, or because they had failed to cooperate with judicial mandates.  The court agrees with Judge Hamilton's treatment of such an order as an arrest warrant and his assessment that it comes with the limited authority to enter the person's dwelling to gain his compliance with the dictates of the order.

Other federal courts have found no Fourth Amendment violation in connection with forced entries carried out in order to enforce civil orders related to the commitment of the mentally infirm.  In *McCabe v. Life-Line Ambulance Service, Inc.*, 77 F.3d 540 (1st Cir. 1996), an elderly woman died as she was being removed from her home after a forced entry by city police officers and an ambulance crew.  The forced entry was made to execute a ten-day involuntary commitment order or "pink paper,"  which is issued in Massachusetts after an expert medical finding that the person poses a likelihood of potential serious harm.  *Id*. at 547-48.  They were acting under an established City policy, permitting forcible, warrantless entries to enforce involuntary civil commitment orders. *Id*. At 542.  The district court granted summary judgment for the woman's estate on its §

17

1983 claim that the policy violated the Fourth Amendment.  *Id*. at 543.  On appeal, the

First Circuit reversed, finding that the policy fell under the "special needs" exception to

the presumption against warrantless entry.  *Id*. at 550-54; *see also Doby v. DeCrescenzo*,

171 F.3d 858, 871 (3rd Cir. 1999)(found that involuntary commitment of those deemed

dangerous to themselves or others qualifies as a "special need" permitting county to act,

in compliance with the Fourth Amendment, without a warrant).

Even if this court were not to give the order of apprehension in this case the same

authority and effect as it would an arrest warrant, the circumstances that existed, with an

escaped or recalcitrant, court ordered, mental health patient refusing to cooperate with

law enforcement, were such that an exception existed to the presumption of a need for a

warrant before entering the residence at 8389 N. Briarhopper Road.  Probable cause to

find Montgomery a danger existed at the time his involuntary commitment was ordered

by the same court that issued the order of apprehension.  Certainly neither the deputies or

the Sheriff's department had reason to expect that the court would have issued an

apprehension order without assessing whether Montgomery continued to pose that danger

to others or himself.[4]  Accordingly, the entry into the residence did not violate

---

[4]The analysis here begins to bleed into the analysis that would be employed in assessing the merit of the deputies' claim of qualified immunity.  However, since the court finds that no constitutional violation occurred when the officers entered the residence, there is no need to assess whether any right to be free from such an entry was so clearly established that any reasonable officer would have been aware of it.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001)(defining two part test for qualified immunity).  For examples of decisions imposing qualified immunity under circumstances involving apprehension of individuals with known or suspected mental health issues, see *Linbrugger v. Abercia,* 363 F.3d 537, 543-44 (5th Cir. 2004);

Montgomery's Fourth Amendment rights.

With the right of the deputies to enter established, the next issue the court must grapple with is whether the use of lethal force by Deputy Hoffman was excessive. This too, is a Fourth Amendment issue, analyzed under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether or not the level of force utilized is excessive is to be measured against the totality of circumstances existing at the scene when the officer's action is taken, not what is understood with the benefit of hindsight. *Id.* at 396. The circumstances include not only the actions of the victim at the time, but the severity of any criminal activity at issue and the knowledge possessed by the officers involved. *Id.*; *see also Richman v. Sheahan*, __ F.3d __, 2008 WL 60186 (7th Cir. 2008).

Use of lethal force is within constitutional bounds if, at the time such force is used, it is reasonable for the officer to believe that he or another officer are in imminent danger of physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In *Pena v. Leombruni*, 200 F.3d 1031, 1033 (7th Cir. 1999), an individual who was suspected of shoplifting and fighting with store employees was shot by an officer when he failed to heed a command to stop and continued approaching the officer with a chunk of concrete in his hand. The Seventh Circuit found that it was undoubtably reasonable for the officer to have anticipated that the individual posed a lethal danger. *Id.* at 1035. Here, it is undisputed

---

*Cruz v. City of Laramie*, 239 F.3d 1183, 1187-89 (10th Cir. 2001); *Gooden v. Howard County,* 954 F.2d 960, 968 (4th Cir. 1992).

that Montgomery was not just approaching the officers with the pipe, but had already landed blows to both Hoffman and Beaver and was continuing to wail on Beaver at the time the shots were fired.

Plaintiff contends that the "totality of circumstances" measurement would encompass the decision of the deputies to force their way into the house with tasers and a gun drawn, despite the fact that they testified in deposition that before they entered the house they were in no fear of imminent danger.  Defendants want the court to focus on the situation that existed when Hoffman fired his gun.  As much as Plaintiff would like the question to be whether it was a good choice to enter the home, the answer to that question provides no basis for holding any of the officers liable.  Even under a due process analysis, neither negligence nor gross negligence suffice to support liability under § 1983.  *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002).  As the Seventh Circuit has stated, "There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used."  *Plakas v. Drinski*, 19 F.3d 1143, 1148 (7th Cir. 1994); *see also Carter v. Busher*, 973 F.2d 1328 (7th Cir. 1992)(defendants "dubious" scheme to bring about arrest notwithstanding, the case on the analysis of the reasonableness of the arrest itself, not the scheme that got the officers to that point).

Very recently, the Seventh Circuit decided a case which, at first blush, might seem to suggest that all the pre-entry circumstances, options and choices made by the deputies

20

should be weighed in assessing whether the use of deadly force was reasonable.  In

*Richman v. Sheahan*, __ F.3d __, 2008 WL 60186 (7th Cir. 2008), a state court judge in

Skokie, Illinois pushed the panic button on his bench to summon deputy sheriffs to quell

the loud protests of an individual complaining that his traffic ticket case had been carried

over to another day.  *Id*. at *1.  When two deputies arrived the judge ordered the

protestor, Jack Richman, to leave the court with the deputies, but he refused.  The judge

held Richman in contempt and continually raised his jail time for contempt as Richman

continued to refuse to leave peaceably and resisted efforts to escort him out. *Id.*

Richman was grossly obese, standing six foot two inches tall and weighing nearly

500 pounds.  He was able to resist the efforts of the initial deputies on the scene, and

continued to resist as more deputies arrived to remove him from the courtroom.  *Id*.

Eventually, the deputies pulled him from the podium he was clinging to and managed to

drag him to the floor, where he continued to struggle.  Several of the deputies climbed on

Richman's back trying to handcuff him as he writhed face down on the floor.  Richman

began screaming that he could not breathe, and eventually went limp and died.  *Id*.  The

autopsy report informed that he died as a result of "positional asphyxia", brought on in

part as a result of his obesity.  *Id*. at *2.  Because sitting on the back of a person,

especially an obese person, can cause the lungs to compress and a resulting shortage of

oxygen in the blood, officers are warned to avoid engaging in such a maneuver.  *Id.*

The deputies were sued by Richman's estate under § 1983.  The lawsuit included

claims of the use of undue force in violation of both the Fourth and Eighth Amendments to the Constitution. *Id.* at *1. A core issue discussed in the opinion was whether the use of force under the circumstances was a Fourth Amendment reasonableness issue or an Eighth Amendment cruel and unusual punishment issue. However, after deciding that the answer to that issue turned on whether there was any intent on the part of the deputies to punish, the court went on to reverse the district court's grant of qualified immunity to the officers for the Fourth Amendment claim. *Id.* at *4-5. In doing so, the Court stated that a reasonable jury could find that the deputies used excessive force because there was no need to act hastily and Richman's size dictated that any removal be executed with care due to his size and the dangers of compressing his lungs in any struggle. *Id.*

Why is the situation at bar different? Shouldn't the deputies' choice to force an entry rather than waiting out Montgomery or waiting for assistance from a relative, be part of the totality of circumstances considered here? While the totality of circumstances might involve a consideration of these facts, the distinction between the circumstances involving Jack Richman and those involving John Montgomery has already been recognized by the Seventh Circuit. As it noted in *Plaskas*, while quoting the Supreme Court:

> This is not a case where an officer claims to have used deadly force to prevent an escape. It is a self-defense case where the officer had "probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer" and, therefore, the officer may use deadly force.

*Plaskas v. Drinski,* 19 F.3d 1143, 1146 (quoting *Tennessee v. Garner,* 471 U.S. 1, 3 (1985)).

In short, it was constitutionally permissible for the deputies to go into the house and attempt to execute on the order of apprehension.  Once they entered and Montgomery became hostile, attacking an officer in a manner that could inflict serious bodily harm, there is no doubt that it was reasonable for Hoffman to use his gun to stop Montgomery from swinging the pipe at Beaver.  This is especially true in light of the deputies' efforts to first use less than lethal force, the Tasers, to subdue him.  It would have been better for all if Worth or Beaver had successfully utilized the Tasers, but their efforts were stymied by Montgomery's own violence and no liability is created by an inaccurate Taser shot.

Plaintiff's claim that Montgomery was not accorded equal protection of the law is a nonstarter.  She does not contend that her son's equal protection rights were violated due to discrimination based on his membership in a protected class, i.e., the mentally disabled.  Rather, she argues without evidentiary support, that Montgomery received different treatment from that which was provided to others with mental disabilities who were picked up under court order in Montgomery County.  In short, plaintiff is making a "class of one" argument with respect to her equal protection claim.

The Seventh Circuit has recognized class of one equal protection claims, but has also noted that they are exceedingly difficult to win.  *McDonald v. Village of Winnetka,*

371 F.3d 992, 1001 (7th Cir. 2004).  A class of one equal protection claim may be

brought where the plaintiff alleges that there was intentional disparate treatment from

others similarly situated and no rational basis for that difference in treatment, or the cause

of the differential treatment was the illegitimate animus of defendants.  *Id*.  Here,

Plaintiff's argument never leaves the ground because she cannot identify any other

mentally ill or disabled individual who was treated differently by the Defendants.

Finally, there is Plaintiff's claim that official capacity liability should be found

against the Sheriff and his department for failure to adequately train the deputies.

"Deliberate indifference" is what she must show with respect to any such claim.  *City of*

*Canton v. Harris,* 489 U.S. 378, 388 (1989).  It is undisputed that each of the deputies

received state mandated training at the Indiana Law Enforcement Training Academy

which included training on the handling of people with diminished mental capacities or

mental illnesses.  Plaintiff has offered opinions and speculation to the effect that the

training provided as a part of the law enforcement academy was insufficient.

Nevertheless, she offered no evidence that the Sheriff had notice that the training was

clearly inadequate, which is the standard she is required to meet.  *See Ross v. Town of*

*Austin*, 343 F.3d 915, 918 (7th Cir. 2003).  Accordingly, Plaintiff's claim of failure to

train fails as well.

## Conclusion

For the reasons discussed in this entry, the court finds that no material questions of fact remain and that Defendants' motion has merit.  Therefore, Defendants' Motion for Summary Judgment (Docket # 36) is **GRANTED** and Plaintiff's Motion to Deny Defendants' Motion for Summary Judgment (Docket # 59) is **DENIED**.  A separate judgment shall issue contemporaneously.

**IT IS SO ORDERED**, this 29th day of February 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Dale Charles Gantz
dcgatty@aol.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

25